IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 1, 2025 Session

## HARRY RAYMOND COLEMAN, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 09-03572          Lee V. Coffee, Judge**

_____

**No. W2024-00648-CCA-R3-PC**

_____

A Shelby County jury convicted the Petitioner, Harry Raymond Coleman, Jr., of second degree murder, among other offenses. The trial court sentenced him to an effective eighteen-year sentence in the Tennessee Department of Correction. Thereafter, the Petitioner filed a post-conviction petition asserting that he was denied the effective assistance of counsel at his trial. More specifically, the Petitioner argued that his trial counsel failed to adequately investigate and present a mental health defense centered around his post-trial diagnosis of Bipolar I disorder. He also claimed that trial counsel failed to call witnesses who would have supported his claim of self-defense. After a hearing, the post-conviction court denied relief, and the Petitioner appealed. Upon our review, we respectfully affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and KYLE A. HIXSON, JJ., joined.

Joseph McClusky (on appeal), William Massey (on appeal and at hearing), and Lauren Fuchs (at hearing), Memphis, Tennessee, for the appellant, Harry Raymond Coleman, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

### A. PETITIONER'S CONVICTION FOR SECOND DEGREE MURDER

In July 2010, a Shelby County jury convicted the Petitioner of second degree murder and related offenses arising from a fatal shooting outside a Memphis restaurant. The convictions were affirmed on direct appeal, and the Tennessee Supreme Court denied further review. To provide context for these issues raised in this appeal, we summarize the underlying facts as set forth in our prior opinion. *See State v. Coleman*, No. W2011-01546-CCA-R3-CD, 2013 WL 427886, at \*1 (Tenn. Crim. App. Feb. 1, 2013), *perm. app. denied* (Tenn. June 11, 2013).

On February 6, 2009, the victim and his family were leaving a restaurant after celebrating a birthday. In the parking lot, the victim became agitated upon discovering that a Hummer was parked closely beside their vehicle, allegedly obstructing the driver's side. The Hummer belonged to the Petitioner.

Shortly thereafter, the Petitioner's wife, Katheryn Coleman, arrived in a separate vehicle and accused the victim of damaging the Hummer. Witnesses described her as confrontational, blocking the victim's vehicle and insisting that the matter be resolved. Mrs. Coleman and the victim exchanged heated words, and some witnesses saw the victim make brief physical contact with her—either a push or an effort to move her away after she repeatedly entered his personal space.

At some point, Mrs. Coleman summoned her husband, the Petitioner. The Petitioner joined the altercation and retrieved a handgun from his Hummer shortly thereafter. He returned to confront the victim, and witnesses observed the Petitioner hold the gun to or near the victim's mouth while gripping his head. The victim reportedly raised his hands and began to back away.

The Petitioner then stepped back and fired a single shot into the victim's chest from at least four feet away. The Petitioner remained at the scene, surrendered his firearm to law enforcement, and asserted a claim of self-defense. Eyewitnesses testified that the victim made no threats or aggressive actions justifying the use of deadly force.

Following his convictions, the Petitioner sought an appeal, raising two issues: (1) whether the evidence was insufficient to support the verdict; and (2) whether a post-trial diagnosis of Bipolar I disorder constituted newly discovered evidence warranting a new trial. This court affirmed the Petitioner's convictions, and the supreme court denied further review on June 11, 2013. *See Coleman*, 2013 WL 427886, at *1.

## B.   POST-CONVICTION PROCEEDINGS

On January 15, 2014, the Petitioner filed a timely petition for post-conviction relief, alleging that he was denied the effective assistance of counsel. As is relevant to this appeal, the Petitioner alleged that his trial attorneys were ineffective in two ways: (1) by failing to investigate and present evidence of the Petitioner's mental health issues; and (2) by failing to call witnesses in support of the Petitioner's claim of self-defense.

The post-conviction court conducted a series of evidentiary hearings between November 2019 and April 2022. At these hearings, the Petitioner called several witnesses, including: (1) a forensic psychiatrist who evaluated him after trial; (2) three individuals he believed should have testified at trial; and (3) one of his two trial attorneys. The State offered no additional proof. The substance of the relevant testimony is summarized below.

### 1.   The Petitioner's Post-Trial Evaluation

In support of his claim regarding his mental health condition, the Petitioner presented testimony from Dr. Kayla Fisher, a forensic psychiatrist who evaluated him at the Memphis Mental Health Institute following a suicide attempt immediately after his conviction. Dr. Fisher observed the Petitioner over three weeks and discharged him while he remained on suicide watch.

Based on her clinical evaluation, psychological testing, and information from the Petitioner, his family, and Dr. Farmer's records, Dr. Fisher diagnosed the Petitioner with Bipolar I disorder with psychotic features. She explained that the Petitioner exhibited paranoia and depression, though he initially resisted the diagnosis. He was initially prescribed an antipsychotic, followed by a mood stabilizer and an antidepressant at discharge. Dr. Fisher believed that the Petitioner had previously been misdiagnosed and inadequately medicated and that his general alcohol use had exacerbated his condition.

3

Dr. Fisher acknowledged that Dr. Farmer, the Petitioner's longtime treating physician, questioned the bipolar diagnosis, noting that the Petitioner's successful business endeavors appeared inconsistent with the condition. Although Dr. Farmer had prescribed medication to treat a bipolar condition after the Petitioner's wife raised concerns, he stated in an affidavit that he lacked sufficient information to make a bipolar diagnosis.

Dr. Fisher testified that she did not evaluate the Petitioner for sanity, competency to stand trial, or diminished capacity at the time of the offense. Her understanding of the circumstances surrounding the shooting derived largely from the Petitioner's journal entries and indirect accounts. She described his emotional state as "defensive" and "in fear." She also acknowledged that although he had placed a gun in the victim's mouth, he did not discharge it and later surrendered the weapon without incident. Dr. Fisher did not offer an opinion on whether the Petitioner's mental illness impaired his ability to distinguish right from wrong.

She also observed that laypersons, such as attorneys, might not recognize the signs of a manic episode and noted that her interpretations of certain behaviors differed from Dr. Farmer's. However, dozens of letters supporting the Petitioner at sentencing did not mention unusual behavior, a fact she attributed to limited exposure by those authors. She testified that she did not rely on those letters in reaching her diagnosis.

### 2. Uncalled Witnesses Relevant to Self-Defense Theory

To support his second claim, the Petitioner presented testimony from three witnesses who were not called at trial.

### a. Testimony of Richard and Robbie Hornsby

The first two witnesses presented by the Petitioner were Richard and Robbie Hornsby. They testified that in April 2004, the victim, whom they did not know, arrived uninvited at their residence in an angry and aggressive state. According to the Hornsbys, the victim was upset because someone had been riding four-wheelers on land behind his house without permission. The Hornsbys attempted to calm the situation and explain their position, but the victim remained belligerent. During the encounter, he threatened to kill the Hornsbys and their pets if they trespassed again. Although the Hornsbys testified that they were frightened by the victim's behavior, they did not obtain a weapon or otherwise

4

arm themselves during or after the altercation. They did, however, purchase a handgun as a result of the encounter.

After learning of the victim's death through a news report, the Hornsbys contacted the defense team to report the prior altercation. They attended the trial and indicated their willingness to testify on the Petitioner's behalf. Trial counsel ultimately chose not to call the Hornsbys as witnesses, later explaining that the defense had "decided to go in a different direction."

### b. Testimony of Clark Plunk

The third witness presented by the Petitioner was Clark Plunk. Mr. Plunk testified that on the night of the shooting, he and the Petitioner were together at a restaurant having a glass of wine. The Petitioner stepped outside, and approximately fifteen minutes later, Mr. Plunk followed to determine what was happening. Leaving the restaurant, he observed a crowd gathered and heard a commotion. He saw the Petitioner argue with the victim and the victim's son.

According to Mr. Plunk, the victim and his son attempted to disarm the Petitioner, but the Petitioner "slapped" their hands away and threatened to shoot them if they did not step back. Mr. Plunk took cover behind a nearby column, and moments later, he heard a single gunshot.

Mr. Plunk acknowledged that he had not reported this version of events to law enforcement in his statement at the time. He testified, however, that he had shared the information with defense counsel and was willing to testify at trial. Mr. Plunk also disclosed that he had suffered a stroke before the Petitioner's trial.

### 3. Trial Counsel's Investigation and Trial Strategy

The Petitioner was represented at trial by two retained attorneys, although only one of them testified at the post-conviction hearing. The testifying lawyer said he pursued a theory of self-defense and defense of the Petitioner's wife.[1] After the conviction, the Petitioner attempted suicide using cotton balls soaked in ether. Following the attempt, he

---

[1] Because only one of the Petitioner's two trial attorneys testified at the post-conviction hearing, we refer to that attorney as "trial counsel" throughout this opinion.

was admitted to a mental health facility, where Dr. Kayla Fisher diagnosed him with Bipolar I disorder.

Trial counsel was aware of the Petitioner's long-standing relationship with Dr. Farmer. The Petitioner and his family told counsel that Dr. Farmer had prescribed mental health medication, but that the Petitioner had not taken it. The family also minimized the importance of the diagnosis, stating that Dr. Farmer "did not know what he was talking about" and that the Petitioner was "fine." Based on these representations and his own observations, trial counsel believed that contacting Dr. Farmer before trial was unnecessary.

Trial counsel later learned that Dr. Farmer had diagnosed the Petitioner with major depressive disorder. At the time of trial, however, he did not consider a mental health defense to be a productive strategy. He explained that their trial strategy relied on portraying the victim as "an angry, drunk, violent man" who was "much larger" than the Petitioner, who was described as "smaller" and "calmer." This characterization supported the defense theory that the Petitioner had acted in lawful self-defense or in defense of his wife.

Trial counsel was aware of individuals who had experienced the victim's aggressive behavior, including Richard and Robbie Hornsby. After discussion with the Petitioner and his wife, trial counsel chose not to call the Hornsbys. He reasoned that the cross-examination of the State's witnesses had already elicited testimony indicating that those witnesses feared the victim. Moreover, the Hornsbys had not responded to the victim's threats with force, contrasting with the Petitioner's actions. Trial counsel was concerned that highlighting this difference might weaken the defense and invite damaging cross-examination.

Trial counsel also addressed the decision not to call Clark Plunk, a potential eyewitness. Although Mr. Plunk was present during the shooting, he told trial counsel that he suffered from mental health issues and a brain injury and, consequently, he could not remember the events clearly. Mr. Plunk also expressed reluctance to participate in the trial. Trial counsel described him as "so squirrely" that counsel "did not want him in the court."

### C.   THE POST-CONVICTION COURT'S DENIAL OF RELIEF

On April 3, 2024, the post-conviction court entered a written order denying relief, concluding that the Petitioner failed to establish ineffective assistance of counsel. The court credited trial counsel's testimony that he observed no signs of mental illness in the Petitioner during the course of trial preparation and that the Petitioner himself dismissed the utility of mental health treatment and refused to take prescribed medications. The court noted that trial counsel also explained that his personal and professional experience did not indicate any reason to seek a forensic evaluation or pursue a mental health-based defense. Recognizing that Dr. Fisher later diagnosed the Petitioner with bipolar disorder and testified about symptoms of paranoia and delusion, the court observed that she did not offer any opinion on the Petitioner's sanity, capacity to form intent, or competency at the time of the offense. The court ultimately found that the testimony from Dr. Fisher would not have been admissible and, even if it had been, would not have changed the outcome. The court also found that the Petitioner offered no evidence establishing that trial counsel was deficient in the investigation of his mental health or that additional inquiry would have altered the result.

As to the failure to present testimony from additional witnesses regarding the victim's aggressive behavior, the post-conviction court credited trial counsel's explanation. Counsel testified that he interviewed these individuals and, after consulting with the Petitioner and his wife, made a strategic decision not to call them. The court found that these decisions were based on concerns about potential weaknesses in their testimony and the risks posed by cross-examination. Trial counsel also employed an investigator to locate all relevant witnesses and succeeded in eliciting testimony about the victim's prior aggressive conduct from other sources. The court concluded that the Petitioner failed to show how additional preparation or the presentation of further witnesses would have changed the outcome.

The Petitioner filed a timely notice of appeal thirty days later. *See* Tenn. R. App. P. 4(a).

### STANDARD OF APPELLATE REVIEW

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). In this case, the principal issue is whether the post-conviction court

properly denied relief because the Petitioner failed to show that he was denied the effective assistance of counsel. As our supreme court has made clear,

> [a]ppellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this [c]ourt reviews de novo. Witness credibility, the weight and value of witness testimony, and the resolution of other factual issues brought about by the evidence are entitled to a presumption of correctness, which is overcome only when the preponderance of the evidence is otherwise. On the other hand, we accord no presumption of correctness to the post-conviction court's conclusions of law, which are subject to purely de novo review.

*Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted).

## ANALYSIS

In this appeal, the Petitioner argues that the post-conviction court erred when it denied relief. More specifically, he asserts that he was denied the effective assistance of counsel because his trial counsel failed to (1) investigate and present evidence of Petitioner's mental health disorder; and (2) call witnesses in support of the Petitioner's claim of self-defense. In response, the State argues that the Petitioner failed to show that trial counsel's performance was deficient or that any claimed deficiencies resulted in prejudice to the Petitioner. We agree with the State.

The Tennessee Post-Conviction Procedure Act provides an avenue for relief "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2018). A post-conviction petitioner has the burden of proving his or her allegations of fact with clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2018). For evidence to be clear and convincing, "it must eliminate any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014) (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

As noted above, the Petitioner alleges in this appeal that he was denied the effective assistance of counsel during his trial. Article I, section 9 of the Tennessee Constitution establishes that every criminal defendant has "the right to be heard by himself and his counsel." Similarly, the Sixth Amendment to the United States Constitution, made

8

applicable to the states by the Fourteenth Amendment, guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Indeed, "[t]hese constitutional provisions guarantee not simply the assistance of counsel, but rather the reasonably effective assistance of counsel." *Nesbit v. State*, 452 S.W.3d 779, 786 (Tenn. 2014). Accordingly, a petitioner's claim that he or she has been deprived "of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act." *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016); *see also Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that counsel's performance was deficient and that counsel's deficiency prejudiced the defense." *Moore*, 485 S.W.3d at 418-19 (citing *Strickland*, 466 U.S. at 687; *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). A petitioner may establish that counsel's performance was deficient by showing that "counsel's representation fell below an objective standard of reasonableness." *Garcia v. State*, 425 S.W.3d 248, 256 (Tenn. 2013) (quoting *Strickland*, 466 U.S. at 688). As our supreme court has also recognized, this court must look to "all the circumstances" to determine whether counsel's performance was reasonable and then objectively measure this performance "against the professional norms prevailing at the time of the representation." *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015) (quoting *Strickland*, 466 U.S. at 688).

"If the advice given or services rendered by counsel are 'within the range of competence demanded of attorneys in criminal cases,' counsel's performance is not deficient." *Phillips*, 647 S.W.3d at 407 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Notably, because this inquiry is highly dependent on the facts of the individual case, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999).

In addition, a petitioner must establish that he or she has been prejudiced by counsel's deficient performance such that the performance "render[ed] the result of the trial unreliable or the proceeding fundamentally unfair." *Kendrick*, 454 S.W.3d at 458 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)). In other words, a petitioner "must establish 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Davidson v. State*, 453 S.W.3d 386, 393-94 (Tenn. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Howard*, 604 S.W.3d at 58 (quoting *Strickland*, 466 U.S. at 694).

## A.   FAILURE TO INVESTIGATE PETITIONER'S MENTAL HEALTH

### 1.   Deficient Performance

We first consider the Petitioner's argument that trial counsel provided ineffective assistance by failing to investigate a potential mental health defense.  The Petitioner asserts that counsel knew the Petitioner had received psychiatric treatment from Dr. Farmer over an extended period, that Dr. Farmer was willing to speak with counsel, and that the Petitioner informed counsel of suicidal thoughts before trial.  In light of this information, the Petitioner argues that trial counsel's failure to interview Dr. Farmer was unreasonable.

The State responds that trial counsel had no reason to suspect that the Petitioner's mental health contributed to the offense based on the results of counsel's initial investigation.  According to the State, the Petitioner minimized his treatment with Dr. Farmer and gave no indication that mental health issues were relevant.  As a result, the State asserts that trial counsel's decision not to pursue further mental health inquiry was a reasonable strategic choice.  We agree with the State.

As an initial matter, "[t]rial counsel has a duty to investigate and prepare a case, and this duty derives from counsel's basic function to make the adversarial testing process work in the particular case." *Nesbit*, 452 S.W.3d at 796 (citation and internal quotation marks omitted).  As such, "[a]lthough trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel has a duty to conduct a reasonable investigation or make a reasonable decision rendering a particular investigation unnecessary." *E.g.*, *Bohanna v. State*, No. W2019-01200-CCA-R3-PC, 2021 WL 1698524, at *21 (Tenn. Crim. App. Jan. 27, 2021) (citing *Strickland*, 466 U.S. at 691), *perm. app. denied* (Tenn. May 14, 2021).

In evaluating whether further investigation may be required generally, courts have emphasized the importance of trial counsel's communications with the defendant.  For example, this court has recognized that the reasonableness of trial counsel's investigative decisions can be significantly impacted by the communications of the defendant:

> A reasonable investigation does not require counsel to leave no stone unturned.  Rather, reasonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources.  The

United States Supreme Court has said, "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."

*Lanier v. State*, No. W2018-01434-CCA-R3-PC, 2020 WL 1547846, at *25 (Tenn. Crim. App. Apr. 1, 2020) (citations omitted).

In the context of a lawyer's duty to investigate a defendant's mental health condition, this court has consistently required that a petitioner demonstrate that counsel either knew or should have known of the existence of that condition. *See, e.g.*, *Timmons v. State*, No. E2017-00335-CCA-R3-PC, 2018 WL 1391630, at *4 (Tenn. Crim. App. Mar. 20, 2018), *perm. app. denied* (Tenn. June 6, 2018). Information that may give rise to a duty to investigate a possible mental health condition further can include statements from mental health professionals, the defendant's family, and trial counsel's observations of the defendant during meetings or hearings. *See, e.g.*, *Metz v. State*, No. M2019-00883-CCA-R3-PC, 2021 WL 58197, at *42 (Tenn. Crim. App. Jan. 7, 2021) (finding deficient performance in a failure to investigate the petitioner's mental health conditions further), *no perm. app. filed*. The information triggering a duty of further investigation may also consist of statements made by the defendant, though we have rejected the proposition "that trial counsel has no duty to investigate unless a defendant affirmatively volunteers information." *Id.* at *41.

Conversely, this court has rejected claims of deficient performance where a petitioner failed to identify clear behavioral indicators that would have alerted reasonably diligent counsel to a potential mental health issue. Indeed, we have declined to find a duty to investigate a mental health condition further in the following circumstances:

- when trial counsel testified that, despite older mental health records, the petitioner was "engaged" and an "active participant" in the proceedings, giving no indication that a present evaluation was warranted, *see, e.g.*, *Bolton v. State*, No. E2022-00836-CCA-R3-PC, 2023 WL 2673150, at *9 (Tenn. Crim. App. Mar. 29, 2023), *no perm. app. filed*;

- when trial counsel testified that the petitioner was "helpful" during the trial and that "he clearly understood everything that was going on," *see Bettis v. State*, No. M2017-01845-CCA-R3-PC, 2018 WL 3342830, at *7 (Tenn. Crim. App. July 9, 2018), *perm. app. denied* (Tenn. Nov. 14, 2018);

11

- when trial counsel lacked any information from "the petitioner, his family members, or others indicating any mental defect/illness" and a previous mental evaluation of the petitioner "did not provide any indication of a potential mental illness," *see Burns v. State*, No. W2004-00914-CCA-R3-PD, 2005 WL 3504990, at *68 (Tenn. Crim. App. Dec. 21, 2005), *perm. app. denied* (Tenn. Apr. 24, 2006); and

- when the petitioner (or others) did not alert trial counsel about a mental health condition, and trial counsel did not observe any behavior that suggested that the petitioner was suffering from a mental health issue, *see Bostic v. State*, No. M2018-01369-CCA-R3-PC, 2019 WL 4052690, at *5 (Tenn. Crim. App. Aug. 28, 2019), *no perm. app. filed*.

Indeed, we have rejected a claim that trial counsel performed deficiently in not further investigating a diagnosis of bipolar disorder when the petitioner, who "presented himself well," "downplayed his mental health history during the intake interview," and "was very clear in his communications[.]" *Johnson v. State*, No. W2011-02123-CCA-R3-PC, 2013 WL 772795, at *6 (Tenn. Crim. App. Feb. 27, 2013), *perm. app. denied* (Tenn. July 1, 2013).

These cases reveal two principal standards. First, trial counsel's decision not to investigate further must be the product of reasoned judgment, not mere inattention. *Metz*, 2021 WL 58197, at *42. Second, "[w]hen assessing the performance of trial counsel, courts must eliminate the 'distorting effects of hindsight' and evaluate the challenged conduct from counsel's perspective at the time, rather than from the perspective of a mental health expert offering testimony in a post[-]conviction proceeding." *See Henley v. State*, 960 S.W.2d 572, 583 (Tenn. 1997). With these standards in mind, we turn to the Petitioner's arguments that trial counsel should have further investigated his mental health condition.

In this case, the post-conviction court credited trial counsel's testimony that he observed no signs of mental illness in the Petitioner during the course of trial preparation and that the Petitioner himself dismissed the utility of mental health treatment and refused to take prescribed medications. The court noted that trial counsel also explained that his personal and professional experience did not indicate any reason to seek a forensic evaluation or pursue a mental health-based defense. The record supports these findings.

During the post-conviction hearing, trial counsel testified that the Petitioner downplayed his interactions with Dr. Farmer and believed there was nothing wrong with his mental health. The Petitioner was not taking the prescribed medication and stated that Dr. Farmer "did not know what he was talking about."

Trial counsel also reported that interviews with the Petitioner's family and friends revealed no indications of mental illness. On the contrary, counsel observed that the Petitioner maintained a successful career, had a supportive family, and enjoyed an active social life.

At no point did trial counsel question the Petitioner's ability to communicate effectively or to understand the circumstances of the case. Counsel's testimony reflects that the Petitioner was engaged in strategic decisions and participated meaningfully in his defense. Based on these observations, along with additional witness interviews and the overall investigation, trial counsel believed that pursuing a mental health defense would not be a productive strategy.

Pushing against this conclusion, the Petitioner argues that trial counsel acted unreasonably in declining to investigate his mental health further. He asserts that, before or during the trial, he told counsel that he was suicidal. When combined with his treatment history and Dr. Farmer's willingness to speak with counsel, the Petitioner contends that this disclosure should have prompted further inquiry.

However, the record does not support the claim that the Petitioner ever disclosed suicidal thoughts to trial counsel before his post-conviction suicide attempt. The Petitioner did not testify at the post-conviction hearing, nor has he cited any evidence in the record to substantiate that he made such a disclosure. Moreover, when asked directly at the hearing whether the Petitioner had disclosed suicidal ideation, trial counsel testified that he did not recall any such disclosure.

Indeed, while the Petitioner's post-conviction suicide attempt led to Dr. Fisher's evaluation of the Petitioner and her eventual diagnosis of Bipolar I disorder, that diagnosis does not change the facts or information available to trial counsel before the Petitioner's conviction. Though Dr. Fisher opined that Dr. Farmer should have been able to diagnose the Petitioner with Bipolar I disorder during his treatment, Dr. Farmer admitted in an affidavit that he did not have "enough information or evidence" to diagnose the Petitioner with that condition.

13

In other words, the Petitioner did not have a Bipolar I diagnosis at the time of trial, and trial counsel further testified that any discussion with Dr. Farmer likely would not have led to further investigation or the presentation of him as a witness at trial. And again, as mentioned above, trial counsel's decision to forgo additional investigation must be viewed alongside the context that neither the Petitioner, the Petitioner's family or friends, or any other witnesses to the offense identified the Petitioner's mental health as having played a role, to any extent, in the shooting.

Considering all the circumstances surrounding trial counsel's decision, we agree with the post-conviction court that trial counsel's decision to forgo further investigation of Petitioner's mental health did not fall below an objective standard of reasonableness. The Petitioner is not entitled to relief on this issue.

### 2.    Prejudice

Next, we turn to the Petitioner's claim of prejudice stemming from trial counsel's failure to investigate his mental health. Petitioner argues that expert testimony concerning his Bipolar I disorder would have supported his theory of self-defense by showing that he had an honest fear of death or serious bodily injury. In essence, he argues that, but for trial counsel's deficiency in failing to investigate his mental health, there is a reasonable probability that the result of his trial would have been different.

The State responds that the Petitioner has failed to show prejudice for two reasons. First, he has not shown that further investigation by trial counsel would have led to the presentation of a mental health defense. Second, even if evidence of the Petitioner's Bipolar I disorder were presented at trial, it would not have impacted the objective analysis of the self-defense theory. We agree with the State.

The defense of self-defense is set forth in Tennessee Code Annotated section 39-11-611, and at the time of the offense in February 2009, the relevant provisions of the statute provided as follows:

> Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

14

(A)    The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B)    The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C)    The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (Supp. 2008).  As our supreme court has recognized, "Self-defense is a complete defense against a murder charge."  *State v. Hawkins*, 406 S.W.3d 121, 128 (Tenn. 2013).

In the context of this case, additional principles related to self-defense are also important.  First, a defendant's beliefs and conduct must be objectively reasonable to support a claim of self-defense.  *State v. Dunn*, No. E2021-00343-CCA-R3-CD, 2022 WL 2433687, at *17 (Tenn. Crim. App. July 5, 2022) (citing *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998)), *perm. app. denied* (Tenn. Dec. 14, 2022).  Thus, the mere fact that a defendant *subjectively* believed that his conduct was justified would not establish this defense.  *See State v. Myers*, No. W2023-00771-CCA-R3-CD, 2024 WL 3220928, at *8 (Tenn. Crim. App. June 28, 2024), *no perm. app. filed*.

Second, it is important not to "conflate[] the ability to use force generally with the use of deadly force."  *State v. Benson*, 600 S.W.3d 896, 906 (Tenn. 2020).  As the supreme court has recognized, "[t]he bar is substantially higher for one trying to fairly raise the issue of the valid use of deadly force."  *Id*.  After all, the statute requires the defendant using deadly force to have had "a reasonable belief that there [was] an imminent danger of death or serious bodily injury."  *See* Tenn. Code Ann. § 39-11-611(b)(2).  Thus, where a victim is unarmed, a jury may consider this fact, with others, in assessing whether the defendant who used deadly force had a reasonable belief that he or she was in imminent danger of death or serious bodily injury and whether the danger creating that belief was real or honestly believed to be real.  *See State v. Dixon*, No. M2016-01517-CCA-R3-CD, 2017 WL 6405153, at *12 (Tenn. Crim. App. Dec. 15, 2017), *perm. app. denied* (Tenn. Apr. 19, 2018); *see also State v. Love*, No. W2021-00233-CCA-R3-CD, 2022 WL 473417, at *10 (Tenn. Crim. App. Feb. 16, 2022), *no perm. app. filed*.

In this case, the post-conviction court found that the Petitioner failed to show how a mental health evaluation would have supported his claim of self-defense at trial and, as such, failed to show prejudice.  The record supports this finding.

Even assuming that additional investigation would have uncovered evidence of the Petitioner's Bipolar I disorder, any such evidence would have related only to the subjective component of a self-defense claim—namely, the Petitioner's personal belief that the use of deadly force was necessary. It would not have affected the jury's assessment of whether that belief was *objectively* reasonable under the circumstances.

The evidence presented at trial strongly undermined the reasonableness of the Petitioner's conduct and directly refuted the objective component of his self-defense claim. The victim was unarmed at the time of the shooting. *See State v. Coleman*, No. W2011-00420-CCA-R3-CD, 2013 WL 427886, at *1 (Tenn. Crim. App. Feb. 1, 2013). No other witness besides the Petitioner testified that the victim threatened the Petitioner or his wife. *Id.* at *9. After a prolonged verbal altercation, the Petitioner walked to his vehicle, retrieved a handgun, and then returned to confront the victim rather than leave the scene. *Id.* at *7. Multiple witnesses testified that the Petitioner threatened to "blow [the victim's] brains out," and one witness saw the Petitioner place the handgun in the victim's mouth before shooting him in the chest. *Id.* at *1, 6-7. The Petitioner himself admitted to pointing the gun at the victim's face and then shooting him in the chest moments later. *Id.* at *10.

As the post-conviction court observed, "the proof was overwhelming." While evidence of the Petitioner's mental health condition may have informed the jury's view of his subjective beliefs, it would not have changed the jury's assessment of the objective reasonableness of his actions. Because the defense of self-defense requires both components, we agree with the post-conviction court that the Petitioner has not shown a reasonable probability that the outcome of the trial would have been different. Accordingly, even if trial counsel had performed deficiently in failing to pursue a mental health defense—and we do not so find—the Petitioner has not established that he suffered prejudice. He is not entitled to relief on this claim.

## B.    FAILURE TO CALL WITNESSES

We next address the Petitioner's claim that trial counsel was ineffective for failing to present three witnesses—Mr. and Mrs. Hornsby and Mr. Plunk—in support of his self-defense claim. According to the Petitioner, the Hornsbys would have testified to the victim's prior aggressive conduct, including an incident that left them so fearful they purchased a firearm for protection. The Petitioner further asserts that Mr. Plunk's testimony was essential to convey the extent of the threat posed by the victim during the events leading up to the shooting.

The State responds that trial counsel interviewed each of these witnesses and considered calling them at trial but ultimately made a strategic decision not to do so. According to the State, that decision reflected counsel's concerns about the witnesses' potential vulnerability to cross-examination or their lack of reliability. Upon review of the record, we conclude that trial counsel's decision not to call these witnesses was a reasonable exercise of professional judgment.

As discussed above, trial counsel "has a duty to investigate and prepare a case, and this duty derives from counsel's basic function to make the adversarial testing process work in the particular case." *Nesbit*, 452 S.W.3d at 796 (citation and internal quotation marks omitted). The duty of counsel is "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Kendrick*, 454 S.W.3d at 458 (citation and internal quotation marks omitted). As part of the duty to investigate and prepare a case, trial counsel generally "has a duty to use witnesses who may be of assistance to the defense." *State v. Zimmerman*, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991). This duty includes calling witnesses who could help persuade the jury to acquit the defendant and those whose testimony may be relevant to establishing a lesser-included offense. *See id.* That said, decisions about what witnesses to call and what specific evidence to present are generally matters of trial strategy. *See Felts v. State*, 354 S.W.3d 266, 285 (Tenn. 2011); *King v. State*, 989 S.W.2d 319, 333 (Tenn. 1999).

In this case, the post-conviction court found that trial counsel interviewed each of these potential witnesses, and, after consulting with the Petitioner and his wife, made a strategic decision not to call them. The record supports these findings.

Trial counsel testified that he was familiar with the testimony that both Mr. and Mrs. Hornsby could have offered. However, he ultimately chose not to present the Hornsbys at trial due to concerns about their potential performance under cross-examination. Specifically, counsel feared they might be compelled to acknowledge that, despite their confrontation with the victim, less aggressive measures than the use of deadly force resolved their situation. Although he declined to call the Hornsbys, counsel successfully introduced testimony through the State's own witnesses—including members of the victim's family—regarding the victim's aggressive behavior and the fear he instilled in others.

Regarding Mr. Plunk, trial counsel testified that his pretrial interactions revealed significant reliability concerns. Mr. Plunk had apparently sustained a brain injury and informed counsel that he could not remember the details of the offense. He also expressed

reluctance about testifying. Counsel described Mr. Plunk as "squirrely" and explained that, based on these interactions, he decided not to call him as a witness at trial.

The Petitioner has not rebutted the strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. We agree with the post-conviction court that counsel's decision not to call these witnesses resulted from reasonable investigation and tactical judgment, not oversight or neglect. We may not second-guess trial counsel's decisions with the benefit of hindsight. *See Dellinger v. State*, 279 S.W.3d 282, 295 (Tenn. 2009) ("[T]he petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." (citation and internal quotation marks omitted)). Accordingly, we conclude that the Petitioner is not entitled to relief on this ground.

## CONCLUSION

In summary, we hold that the post-conviction court properly found that the Petitioner was not denied the effective assistance of counsel during his trial. Accordingly, because the Petitioner's convictions or sentences are not void or voidable because of the violation of a constitutional right, we respectfully affirm the denial of post-conviction relief in all respects.

s/ **Tom Greenholtz**
TOM GREENHOLTZ, JUDGE